**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:17 cr 9**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **JERALD DEANGELO GREEN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

     **THIS MATTER** is before the Court on Defendant's Motion to Suppress (# 9). On May 23, 2017, the undersigned conducted an evidentiary hearing and heard evidence from both the Government and Defendant. The issues have been fully briefed, and the matter is now ripe for ruling. For the reasons set forth below, it is recommended that Defendant's Motion to Suppress be DENIED.

**I.**     **Procedural Background**

     On February 8, 2017, Defendant was charged in a one-count bill of indictment (# 1), which charges that on or about September 21, 2016, in Buncombe County, within the Western District of North Carolina, Defendant did knowingly and intentionally possess with intent to distribute a quantity of cocaine base, more commonly known as "crack cocaine," a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).[1]

     On April 5, 2017, Defendant filed the instant Motion to Suppress (# 9), in which he moves for this Court to suppress all evidence obtained by the Government pursuant to his unlawful arrest

---

[1] The offense involved a mixture and substance containing a detectable amount of cocaine base.

on September 21, 2016.  On April 26, 2017, the Government filed its Response (# 19) in opposition, arguing that law enforcement had reasonable suspicion to conduct a pat down, which led to Defendant's lawful arrest.  In addition, law enforcement acted in good faith when they arrested Defendant on a belief that there was an outstanding warrant for his arrest.

The Court held an evidentiary hearing on May 23, 2017.  On May 24, 2017, the Government filed a Motion to Supplement the Record (# 32) to add Government's Exhibit 13 to the record.[2]  Defendant did not object, and the Court granted the motion.  On May 30, 2017, Defendant filed an additional brief entitled "Closing Argument" (# 34).  The Government filed its additional brief on June 9, 2017 (# 37).

## II.     The Government's Evidence

### A.     Steve Hendricks

Steve Hendricks ("Hendricks"), a detective with the Asheville Police Department, is presently assigned to work with the Buncombe County Anti-Crime Task Force ("BCAT").  (Hr'g Tr. 83, May 23, 2017.)  The BCAT is a plain-clothes unit assigned to investigate controlled substance violations.  (Hr'g Tr. 83, May 23, 2017.)  Detective Hendricks was previously assigned to the Asheville Police Department Drug Suppression Unit for a period of approximately seven years.  (Hr'g Tr. 83-84, May 23, 2017.)  Based on Detective Hendricks' experience, he has typically found that a drug buyer will find a deal via cell phone or other means.  (Hr'g Tr. 85, May 23, 2017.) The buyer will then meet the dealer and conduct a brief hand-to-hand transaction for the distribution of illegal narcotics.  (Hr'g Tr. 85, May 23, 2017.)

Detective Hendricks is familiar with an area in Buncombe County known as the Deaverview-Crossroads area.  (Hr'g Tr. 87, May 23, 2017.)  Detective Hendricks has observed

---

[2] Government's Exhibit 13 is a certified copy of the second order for arrest.

hand-to-hand illegal drug transactions in the area. (Hr'g Tr. 88, May 23, 2017.) Detective Hendricks considers the area to be "an open air drug market." (Hr'g Tr. 87, May 23, 2017.)

Detective Hendricks has known Defendant since October of 2015, when Detective Hendricks was the case agent in a drug investigation where Defendant sold crack cocaine on three separate occasions to undercover agents. (Hr'g Tr. 89, 94, 112, May 23, 2017.) In one of the drug transactions, which occurred on November 11, 2015, Defendant made arrangements to sell crack cocaine, and during the delivery, Nikkisha Griffin ("Griffin") assisted Defendant by actually delivering the crack cocaine to undercover officers. (Hr'g Tr. 93-94, May 23, 2017.)

On September 21, 2016, Detective Hendricks, other members of the BCAT, and additional law enforcement officers of the SCET team were observing activity at a location where illegal drugs are sold on Deaverview Road. (Hr'g Tr. 95, May 23, 2017.) Detective Hendricks positioned himself in an undercover truck that he parked in the parking lot of the Crossroads Grocery Store. (Hr'g Tr. 96, 100, May 23, 2017.) Detective Hendricks was wearing regular street clothes, and he was using radio and cell phone devices for communication. (Hr'g Tr. 100, May 23, 2017.)

After sitting in the parking lot for about 20 minutes, Detective Hendricks observed a red sedan drive into the parking lot and back into one of the parking places. (Hr'g Tr. 101-02, 130, May 23, 2017.) The red sedan was driven by Griffin, and Defendant was a passenger. (Hr'g Tr. 102, May 23, 2017.) Griffin got out of the red sedan and went into the Crossroads Grocery Store. (Hr'g Tr. 103, May 23, 2017.) Detective Hendricks called on the radio to other officers and told them Defendant was present in the vehicle and asked them to check for outstanding warrants. (Hr'g Tr. 103, May 23, 2017.) Deputy Jason Lambert ("Lambert") called back on the radio and stated that there were two outstanding warrants for Defendant's arrest. (Hr'g Tr. 104 145, 154, May 23, 2017.)

Detective Hendricks then observed a white male walk up to the passenger side of the red sedan and engage in a hand-to-hand transaction with Defendant, who was still seated in the passenger seat of the red sedan. (Hr'g Tr. 105-06, 130-131, May 23, 2017.) Detective Hendricks observed a second white male approach the red sedan, and another hand-to-hand transaction was conducted between Defendant and the second white male. (Hr'g Tr. 107-108, 125, 131, May 23, 2017.) Based on Detective Hendrick's knowledge of Defendant's past criminal history and Detective Hendrick's training and experience, it was his opinion that Defendant sold illegal drugs to the two men. (Hr'g Tr. 108, May 23, 2017.) Detective Hendricks reported over the radio to the other officers that he had witnessed the two hand-to-hand illegal drug transactions. (Hr'g Tr. 107-108, May 23, 2017.)

Less than five minutes after Defendant arrived at the parking lot of the Crossroads Grocery Store, a second vehicle pulled into the parking lot and backed into a parking space alongside the red sedan where Defendant was riding as a passenger. (Hr'g Tr. 120, May 23, 2017.) The driver of the second vehicle was identified by Detective Hendricks as Kaylun Fullwood ("Fullwood"), and it was determined he did not possess a valid driver's license. (Hr'g Tr. 108-110, May 23, 2017.) A third vehicle pulled into the parking lot and parked beside the second vehicle, which was being operated by Fullwood. (Hr'g Tr. 109, May 23, 2017.) The passenger in the third vehicle, Darius Thomas ("Thomas"), got into the passenger seat of Fullwood's vehicle. (Hr'g Tr. 109-110, 120, May 23, 2017.) Detective Hendricks advised uniformed law enforcement in the area to move in and arrest Defendant on his outstanding warrants and arrest Fullwood for driving without a valid license. (Hr'g Tr. 110-111, May 23, 2017.)

### B.     Jason Lambert

Lambert, a Deputy with the Buncombe County Sheriff's Office, works for the SCET and is also a K-9 handler. (Hr'g Tr. 137, May 23, 2017.) Deputy Lambert has been a law enforcement officer for twelve years. (Hr'g Tr. 137, May 23, 2017.)

On September 21, 2016, Deputy Lambert was working with the SCET and assisting the BCAT with a surveillance operation in the Deaverview-Crossroads area of Buncombe County. (Hr'g Tr. 138, May 23, 2017.) Deputy Lambert was in a patrol vehicle parked in an apartment complex on Pisgah View Road. (Hr'g Tr. 139, May 23, 2017.) Deputy Lambert knew that Detective Hendricks was sitting in the area of the Crossroads Grocery Store. (Hr'g Tr. 140, May 23, 2017.)

Deputy Lambert heard Detective Hendricks call on the radio and state that he had seen a vehicle, in which Defendant was riding as a passenger, pull into the Crossroads Grocery Store parking lot, and he had observed Defendant conduct two hand-to-hand drug transactions. (Hr'g Tr. 140, 149-150, May 23, 2017.) Deputy Lambert knew Defendant as a result of an investigation that occurred just about a week prior to September 21, 2016. (Hr'g Tr. 140-41, May 23, 2017.)

Deputy Lambert used his in-car computer to examine the Records Management System ("RMS") to see if there were any outstanding warrants for Defendant's arrest. (Hr'g Tr. 141, May 23, 2017.) Deputy Lambert discovered two outstanding warrants, which were based on Grand Jury indictments. (Hr'g Tr. 141, 153-154, May 23, 2017.) Detective Lambert explained that he has used the RMS system for the past 12 years because it has been active since he was hired. (Hr'g Tr. 141-143, May 23, 2017.) Deputy Lambert further explained that he did not check for warrants on the NCAware system because he did not use the system on a daily basis.[3] (Hr'g Tr. 143, May 23, 2017.) Deputy Lambert further explained that the usual operating procedure is after using the

---

[3] NCAware is not generally used because it times out, which requires the user to log in each time it is used. (Hrg Tr. 143, May 23, 2017.)

RMS to contact communications to verify the information on RMS. (Hr'g Tr. 144-145, May 23, 2017.)

After discovering two outstanding warrants for Defendant's arrest, Deputy Lambert advised the officers on the BCAT channel about the active warrants. (Hr'g Tr. 145, 154, May 23, 2017.) A short time later, Deputy Lambert received instructions from Detective Hendricks to make an encounter with Defendant and Fullwood, which would be based on the hand-to-hand transactions, warrants for Defendant's arrest, and Fullwood operating a motor vehicle without a valid license. (Hr'g Tr. 152-153, 155, May 23, 2017.)

In accordance with Detective Hendricks' instructions, Deputy Lambert traveled to the Crossroads Grocery Store parking lot and pulled his patrol vehicle in front of the red sedan where Defendant was sitting as a passenger. (Hr'g Tr. 146, May 23, 2017.) As Deputy Lambert exited his patrol vehicle, he saw Deputies Nathan Ball ("Ball") and Roger Warren ("Warren") encountering Defendant. (Hr'g Tr. 146, May 23, 2017.) Deputy Lambert went to the vehicle where Fullwood was located. (Hr'g Tr. 146-147, May 23, 2017.) Before Defendant was arrested, Deputy Warren called communications to confirm that the warrants for Defendant's arrest remained outstanding. (Hr'g Tr. 156, May 23, 2017.)

### C.    Roger Warren[4]

Deputy Warren, employed with the Buncombe County Sheriff's Office since 2006, works on the SCET and is also a K-9 supervisor. (Hr'g Tr. 160, May 23, 2017.) On September 21, 2016, Deputy Warren was in the Deaverview Community in a vehicle with Deputy Ball assisting officers with the BCAT. (Hr'g Tr. 161-162, May 23, 2017.) The SCET is a uniformed branch connected

---

[4] Photographs illustrating Deputy Warren's testimony were introduced into evidence as Government Exhibits 8A and 8B. (Hr'g Tr. 180-181, May 23, 2017.)

to the BCAT team, which performs law enforcement services for BCAT.  (Hr'g Tr. 161-62, May 23, 2017.)

While in his patrol vehicle, Deputy Warren heard a call on the radio from Detective Hendricks, who stated that he was located in the parking lot of the Crossroads Grocery Store and had observed what appeared to be hand-to-hand drug transactions.  (Hr'g Tr. 164, May 23, 2017.) Detective Hendricks also provided Defendant's name.  (Hr'g Tr. 163-164, 190, May 23, 2017.) Deputy Warren heard Deputy Lambert on the radio state that there were two outstanding warrants for Defendant's arrest.  (Hr'g Tr. 163-164, 190, May 23, 2017.) Deputy Warren also heard Detective Hendricks state that Fullwood was in the area.  (Hr'g Tr. 164, May 23, 2017.)  While Deputy Warren was driving, Deputy Ball used the patrol vehicle's computer and determined that Fullwood's driver's license was suspended.  (Hr'g Tr. 164, May 23, 2017.)

Deputy Warren knew that the Crossroads area was a high-crime area.  (Hr'g Tr. 165, May 23, 2017.)  Just two weeks prior to September 21, 2016, Deputy Warren made two felony arrests, which included a foot chase in that parking lot and an assault.  (Hr'g Tr. 165, May 23, 2017.) Deputy Warren knew that Fullwood and Defendant were violent offenders on the "DCI," which is a violent criminal offender program.  (Hr'g Tr. 166-167, May 23, 2017.)

When Deputies Warren and Ball arrived at the Crossroads Grocery Store parking lot, Deputy Warren parked his patrol vehicle, a Chevrolet Tahoe, in front of the red sedan in which Defendant was riding as a passenger.  (Hr'g Tr. 168-169, May 23, 2017.)  Deputy Warren then exited his patrol vehicle and started toward Defendant.  (Hr'g Tr. 169, May 23, 2017.)  Deputy Warren saw Defendant reach behind his body, and Deputy Warren feared Defendant was reaching for a weapon.  (Hr'g Tr. 169-170, 180, May 23, 2017; Gov.'s Exs. 8A, 8B.) Deputy Warren pulled his weapon.  (Hr'g Tr. 169, May 23, 2017.)  Deputy Warren told Defendant to bring his hands out

and quit reaching behind his body. (Hr'g Tr. 169-170, May 23, 2017.) After Defendant brought his hands out from behind his back, Deputy Warren holstered his weapon, told Defendant to keep his hands up, and handcuffed Defendant while inside the vehicle. (Hr'g Tr. 170, May 23, 2017.)

Deputy Warren told Defendant to exit the vehicle, and as Defendant did so, Deputy Warren noticed that Defendant was not wearing a shirt and was wearing his pants much lower on his body than Defendant's boxer shorts. (Hr'g Tr. 171-172, May 23, 2017.) Deputy Warren could see a bulge in the rear of Defendant's boxer shorts and could also see a plastic baggy sticking out of the boxer shorts at Defendant's buttocks. (Hr'g Tr. 172-173,191-192, May 23, 2017.) Based on Deputy Warren's training and experience, he believed that the baggy was of the type used to hold narcotics. (Hr'g Tr. 173, May 23, 2017.)

Deputy Warren brought Defendant to the front of the red sedan and conducted what is referred to as a "pat down." (Hr'g Tr. 173, May 23, 2017.) Deputy Warren could see the bag inside Defendant's underwear, and when Deputy Warren tried to roll the bag out of Defendant's underwear, the bag fell down into Defendant's pants.[5] (Hr'g Tr. 173-174, May 23, 2017.) It appeared that the bag contained crack cocaine. (Hr'g Tr. 174, May 23, 2017.)

After Deputy Warren attempted to remove the bag from Defendant's boxer shorts, he called for Deputy Ball to stay with Defendant. (Hr'g Tr. 177, May 23, 2017.) Deputy Warren went to his vehicle to obtain gloves. (Hr'g Tr. 177, May 23, 2017.) At that time, Thomas fled from the scene, and Deputy Warren pursued him. (Hr'g Tr. 177-178, May 23, 2017.) While Deputy Warren was gone, Deputy Ball retrieved the plastic baggy out of Defendant's pants. (Hr'g Tr. 193-194, May 23, 2017.)

---

[5] The Government introduced into evidence Government's Exhibit 9A, which illustrated Defendant's boxer shorts, pants, and the bulge Deputy Warren saw at 3:42 p.m. on September 21, 2016. (Hr'g Tr. 174-175, May 23, 2017; Gov.'s Ex. 9A.) The photograph and the video tape that were introduced into evidence show the bulge in Defendant's underwear. (Gov.'s Exs. 9, 9A.)

After Defendant was placed in custody, Deputy Warren called on his radio to verify the two outstanding warrants for Defendant's arrest. (Hr'g Tr. 194-195, May 23, 2017; Gov.'s Ex. 3 at 6.) Deputy Warren received a call back from communications, which confirmed that the two warrants for arrest were outstanding. (Hr'g Tr. 194-196, May 23, 2017; Gov.'s Ex. 3.)

### D. Nathan Ball

Ball, employed by the Buncombe County Sheriff's office since October of 2014, has been a member of the SCET for two years. (Hr'g Tr. 200, May 23, 2017.) Deputy Ball has 18 years of experience in law enforcement. (Hr'g Tr. 201, May 23, 2017.)

Prior to September 21, 2016, Deputy Ball did not know Defendant, but he did know Fullwood. (Hr'g Tr. 201, May 23, 2017.) Deputy Ball knew Fullwood was a "VCI offender," was on federal probation for a firearms offense, and had been involved in a shooting at Erwin High School. (Hr'g Tr. 201-202, May 23, 2017.)

On September 21, 2016, Deputy Ball was riding with Deputy Warren near the Crossroads Grocery Store in the Deaverview community. (Hr'g Tr. 202, May 23, 2017.) Deputies Ball and Warren were assisting the BCAT with an ongoing investigation they had. (Hr'g Tr. 202, May 23, 2017.) While traveling to the Crossroads area, Deputy Ball heard Deputy Lambert state that there were outstanding warrants for Defendant's arrest. (Hr'g Tr. 203-204, May 23, 2017.) Deputy Ball knew that Deputy Lambert had checked on Defendant through Deputy Lambert's in-car computer system and had used RMS. (Hr'g Tr. 204, May 23, 2017.)

Deputy Ball heard that Defendant was located in the parking lot of the Crossroads Grocery Store and Detective Hendricks had radioed that he had witnessed what he believed to be two hand-to-hand drug transactions. (Hr'g Tr. 204-205, 221-223, May 23, 2017.) Deputy Ball heard Detective Hendricks state over the radio that a vehicle operated by Fullwood had pulled into the

parking lot.  (Hr'g Tr. 205, 221-223, May 23, 2017.)  Deputy Ball proceeded to check on the in-car computer and determined that Fullwood's driver's license was suspended. (Hr'g Tr. 205, May 23, 2017.)  Deputy Ball checked on the RMS and found that Fullwood did not have any outstanding warrants for his arrest.  (Hr'g Tr. 206, May 23, 2017.)

Deputies Ball and Warren proceeded to the Crossroads Grocery Store to arrest Defendant on the outstanding warrants and arrest Fullwood for driving on a suspended license.  (Hr'g Tr. 206-207, May 23, 2017.)  Deputy Warren pulled into the parking lot and positioned his patrol car in front of the two parked vehicles, one where Defendant was seated as a passenger and the other where Fullwood was seated in the driver's seat.  (Hr'g Tr. 207, May 23, 2017.)  Deputy Ball got out of the patrol car and went to the driver's side of the red sedan, where Defendant was riding as a passenger.  (Hr'g Tr. 207, May 23, 2017.)

Deputy Ball saw Defendant put his hands behind his back as if he was either trying to conceal something or pull something from behind his back.  (Hr'g Tr. 207, May 23, 2017.)  Deputy Ball had Griffin, the operator of the vehicle, exit the red sedan.  (Hr'g Tr. 208, May 23, 2017.)  Deputy Ball then went around the red sedan to the passenger side to assist Deputy Warren.  (Hr'g Tr. 208, May 23, 2017.)  As Deputy Warren was walking Defendant toward the front of the red sedan, Deputy Warren indicated that Defendant had something down the back of his pants.  (Hr'g Tr. 208, May 23, 2017.)  Deputy Ball saw a bulge in the back of Defendant's underwear.  (Hr'g Tr. 208, May 23, 2017.)  When Deputy Warren pulled the elastic band of the underwear out, Deputy Ball could see a baggy that appeared to contain multiple crack cocaine rocks. (Hr'g Tr. 208, May 23, 2017.)

At that time, Thomas, who had been in the vehicle operated by Fullwood, fled from law enforcement.  (Hr'g Tr. 209, May 23, 2017.)  Deputy Ball stayed with Defendant, Fullwood, and

Griffin while the other officers pursued Thomas. (Hr'g Tr. 209-210, May 23, 2017.) Deputy Ball put on gloves and pulled from Defendant's underwear the clear baggy that appeared to contain cocaine.[6] (Hr'g Tr. 210, May 23, 2017.) Currency in the amount of $131.00 was also seized from Defendant. (Hr'g Tr. 211-212, May 23, 2017.)

Deputy Ball was wearing a body camera during the encounter with Defendant, which recorded footage that was introduced during the evidentiary hearing.[7] (Hr'g Tr. 214, May 23, 2017; Gov.'s Ex. 9.) Government's Exhibits 9, 9B, 9C, 9D, and 9E are photographs that show the baggy containing the crack cocaine taken from Defendant's underwear and placed on the hood of the red sedan. (T. p. 217).

### E. Brian Houze

Brian Houze ("Houze"), the Public Safety Administrator Software Manager for Buncombe County, is the administrator responsible for storing and maintaining the software used by Buncombe County public safety officials. (Hr'g Tr. 9-10, May 23, 2017.) Houze has access to the RMS, which includes records of outstanding warrants, arrest records, and other types of records. (Hr'g Tr. 10, May 23, 2017.) RMS maintains records of charges, the issuance of warrants, and reflects if a warrant is active or not. (Hr'g Tr. 10, May 23, 2017.) RMS hosts records for Buncombe County Sheriff's Office, Asheville Police Department, and Woodfin Police Department. (Hr'g Tr. 12, May 23, 2017.) The Centralized Data Entry, or RMS, was jointly founded by Buncombe County and the City of Asheville and has been used in Buncombe County for fifteen years. (Hr'g Tr. 35-36, 39, May 23, 2017.)

---

[6] The suspected crack cocaine was analyzed by the North Carolina State Crime Laboratory and determined to be 20 rocks of crack cocaine weighing 2.37 grams. (Hr'g Tr. 212-214, May 23, 2017; Gov.'s Ex. 11.)
[7] The undersigned reviewed Government's Exhibit 9, in its entirety, on multiple occasions.

Houze is familiar with the program referred to as "NCAware," which is a statewide warrant repository system developed and maintained by the Administrative Office of the Courts. (Hr'g Tr. 12, May 23, 2017.) NCAware is not maintained by Buncombe County. (Hr'g Tr. 12, May 23, 2017.) Buncombe County adopted the NCAware system in February of 2014, but decided to also continue using the RMS system. (T. p. 31.) A decision was made not to interface NCAware with the RMS because the cost was in excess of $500,000, and it would take a year and a half to two and a half years to complete. (Hr'g Tr. 37-38, May 23, 2017.) In July of 2016, Buncombe County began a process of nightly attempting a validation program to compare NCAware with the RMS. (Hr'g Tr. 34-35, May 23, 2017.)

An officer in the field can access information about active warrants from RMS by either using a laptop computer or by calling a dispatcher or communicator to verify the warrant. (Hr'g Tr. 15-16, May 23, 2017.) There have been a few instances where a person has been served with a warrant, yet the RMS system reflects that the warrant is still outstanding. (Hr'g Tr. 16-17, May 23, 2017.)

Houze identified Government's Exhibits 1 and 2, which are from the RMS for Buncombe County and show that warrant numbers 851004 and 851005 were issued for Defendant and recalled at 7:23 p.m. on September 21, 2016. (Hr'g Tr. 18-25, May 23, 2017.) This was more than three hours after Defendant's arrest. (Hr'g Tr. 18-27, May 23, 2017; Gov.'s Exs. 1, 2.) Prior to 7:23 p.m. on September 21, 2016, the RMS system would have shown law enforcement officers that the two warrants were outstanding and active. (Hr'g Tr. 28, May 23, 2017.)

### F.     Brooke Hazlett

Brooke Hazlett ("Hazlett"), the Communications Director for the Buncombe County Sheriff's Office, testified that "communications" for the Sheriff's Office means radio dispatch,

911 calls, animal control calls, Crime Stoppers, and administrative line. (Hr'g Tr. 43, May 23, 2017.) Hazlett explained that many contacts between officers and dispatchers or communicators are recorded. (Hr'g Tr. 47, May 23, 2017.)

Hazlett identified a file bearing number 2016-225915, which is an event I.D. record that links calls together to the number that identifies a computer record to the events in the case. (Hr'g Tr. 44-45, May 23, 2017; Gov.'s Ex. 3). Government's Exhibit 3 is a copy of an Event Report for incident file number 2016-225915. (Hr'g Tr. 45, May 23, 2017.) The record is a written record of the event where Defendant was arrested at 482 Deaverview Road. (Hr'g Tr. 49, May 23, 2017.) Government's Exhibit 3 has a notation of "Events, Notes, Addendum," which records all notes that communicators make on a radio call. (Hr'g Tr. 52, May 23, 2017; Gov.'s Ex. 3.) Government's Exhibit 3 also shows that a driver's license number of 20664218 and the name of "Gerald Green" was provided for communicators to check to see if there were any warrants outstanding for Defendant. (Hr'g Tr. 55, May 23, 2017.) A communicator checks driver's licenses and N.C.I.C. to see if a person is wanted on the national or state level, NCAware to check North Carolina for warrants, and RMS to see if there are warrants outstanding in Buncombe County. (Hr'g Tr. 55, May 23, 2017.) The driver's license number 20664218 is Defendant's driver's license number. (Hr'g Tr. 79, May 23, 2017.) When a communicator checks for warrants, he or she is required to check both RMS and NCAware.[8] (Hr'g Tr. 76, May 23, 2017.)

Government's Exhibit 3 reflects a confirmation at 4:06 p.m. on September 21, 2016, which "shows two Grand Jury indictments reference delivering cocaine." (Hr'g Tr. 60, 80, May 23, 2017; Gov. Ex. 3.) Hazlett testified that if a warrant shows as outstanding in RMS system, but not on NCAware, the communicator will call the Centralized Data Entry office and have that operator tell

---

[8] Hazlett explained that this is an in-house County policy. (Hrg Tr. 76, May 23, 2017.)

them over the telephone whether or not there is paperwork that supports the warrant as outstanding. (Hr'g Tr. 58, 61, May 23, 2017.)  A system number must be provided for an individual who is the subject of the request.  (Hr'g Tr. 61, May 23, 2017).  Defendant's System number is 446933.  (Hr'g Tr. 61, May 23, 2017.)

Each individual person that has a file with the Buncombe County Sheriff's Office has what is referred to as a "face sheet." (Hr'g Tr. 60, May 23, 2017.)  The face sheet shows each person's system I.D. number.[9]  (Hr'g Tr. 61, May 23, 2017.).  Hazlett identified the face sheet for Defendant, which reflects he has been assigned I.D. number 446933. (Hr'g Tr. 61-63; Gov.'s Ex. 5.)

Hazlett stated that a recording was made of the communications of the radio traffic between law enforcement and communications for the September 21, 2016, event.  (Hr'g Tr. 64-68, 76, May 23, 2017; Gov.'s Ex. 6.)  The recording shows a request by an officer "Edward 6," for records to be checked on Defendant with license number 2664218 at 4:02 p.m. (Hr'g Tr. 67-68, May 23, 2017.)  In the recording, a communicator confirms that there are two outstanding warrants for Defendant.  (Hr'g Tr. 80; Gov.'s Ex. 6.)

Hazlett explained that in-house policy requires that when an officer asks a dispatcher to check for warrants on a person, the dispatcher must check on both RMS and NCAware.  (Hr'g Tr. 76-77, May 23, 2017.) In accordance with that policy, a third communicator placed a telephone call to CDE using the identifying system number attached to the RMS file for Defendant to confirm the two outstanding warrants for Defendant's arrest seen in RMS.  (Hr'g Tr. 69, 77-78, May 23, 2017.)  A recording was made of that telephone call and was introduced into evidence as Government's Exhibit 7.  (Hr'g Tr. 69, May 23, 2017.)  In the recording, a communicator identified as "Ruth" requests confirmation of the existence of outstanding warrants for Defendant's arrest.

---

[9] A system I.D. number is a number assigned to each person when they're put into RMS.  (Hrg Tr. 61, May 23, 2017.)

(Hr'g Tr.70, May 23, 2017; Gov.'s Ex. 7.) "Philip," with CDE, responds that he has the written warrants in hand. (Hr'g Tr. 70-72, May 23, 2017; Gov. Ex. 7.)

Hazlett testified that the recording revealed that the communicator or dispatcher at Buncombe County Sheriff's Office had spoken on the telephone and verified with a representative of CDE that the paper warrants existed. (Hr'g Tr. 70-71, May 13, 2017.) The communicator then advised the original requesting officer that the warrants were confirmed through CDE. (Hr'g Tr. 70-72, May 23, 2017.)

With respect to this case, there was a check with the communicator to confirm Defendant had warrants outstanding, and the record showed they were. (Hr'g Tr. 81, May 23, 2017.) A telephone call was then made to get confirmation of that fact, and the person in the records department confirmed by stating, "I've got them in my hand." (Hr'g Tr. 81, May 23, 2017.)

## III.    Defendant's Evidence

### A.    James Alexander Bass

James Alexander Bass ("Bass"), is an Assistant District Attorney in Buncombe County, North Carolina. (Hr'g Tr. 226, May 23, 2017.) In late 2015 and early 2016, Bass prosecuted criminal charges against Defendant. (Hr'g Tr. 226, May 23, 2017.)

On November 2, 2015, Detective Hendricks testified before the Grand Jury with respect to an indictment that was later issued charging Defendant with three counts of the sale and delivery of cocaine in file number 15-CRS-4764. (Hr'g Tr. 228, May 23, 2017.) Seven months later, on June 6, 2016, Officer J. D. May testified before the Grand Jury on bills of indictment that were issued charging Defendant with two counts of delivery of cocaine in files numbers 16-CRS-406 and 16-CRS-407. (Hr'g Tr. 228, May 23, 2017.) On July 13, 2016, Defendant pled guilty to one count of delivery of cocaine, in file number 15-CRS-4764, and the two other counts were

dismissed. (Hr'g Tr. 228-230, May 23, 2017.) At that time, Bass also dismissed the charges, in file numbers 16-CRS-406 and 16-CRS-407. (Hr'g Tr. 228, May 23, 2017.)

Bass could not recall if he discussed Defendant's plea agreement or offer with Detective Hendricks. (Hr'g Tr. 230, May 23, 2017.) Bass also could not recall if Detective Hendricks was present in court on the day of the plea. (Hr'g Tr. 231, May 23, 2017.) Bass stated that he filed written dismissals with the Clerk of Court on July 13, 2016, with regard to file numbers 16-CRS-406 and 16-CRS-407. (Hr'g Tr. 231, May 23, 2017.) Bass identified that an order for arrest was in fact issued for Defendant, in file 16CRS406, on June 6, 2016. (Hr'g Tr. 236-38, May 23, 2017; Gov.'s Ex. 12.). It was later stipulated that an order for arrest was also issued for Defendant on June 6, 2016, in file number 16CRS407 (Gov.'s Exs. 13, 33).

### B. Catherine Lewis

Catherine Lewis ("Lewis") is employed as a Deputy Sheriff for Buncombe County as a member of the SCET. (Hr'g Tr. 244-245, May 23, 2017.) On September 21, 2016, Deputy Lewis was working in the area of Deaverview and Pisgah Road when she was requested by BCAT agents to assist them at Crossroads Grocery. (Hr'g Tr. 245, May 23, 2017.) Deputy Lewis heard on the radio there were wanted subjects in the Crossroads Grocery Store parking lot. (Hr'g Tr. 246, May 23, 2017.) Deputy Lewis heard Detective Hendricks state he recognized Defendant and was requesting confirmation for warrants, the warrants were in fact confirmed, and Detective Hendricks had observed hand-to-hand drug transactions. (Hr'g Tr. 246-248, 251, May 23, 2017.)

When Deputy Lewis arrived at the Crossroads Grocery, she dealt with Thomas, who was in Fullwood's vehicle. (Hr'g Tr. 249, May 23, 2017.) Deputy Lewis searched Thomas and found what she thought was crack cocaine. (Hr'g Tr. 249, May 23, 2017.) Thomas later fled from the scene, but he was apprehended. (Hr'g Tr. 251, May 23, 2017.)

### C. Nikkisha Griffin

Griffin, Defendant's fiancé from Asheville, North Carolina, was with him at Crossroads Grocery Store parking lot on September 21, 2016. (Hr'g Tr. 257-258, May 23, 2017.) Griffin was driving her vehicle, and Defendant was riding as a passenger. (Hr'g Tr. 258, May 23, 2017.) Defendant and Griffin were traveling from Spivey Mountain to Smoky Park to a hotel. (Hr'g Tr. 258, May 23, 2017.) Griffin stopped at the Crossroads Grocery to get a Pepsi and some tobacco. (Hr'g Tr. 258, May 23, 2017.). Griffin explained that she goes to the Crossroads Grocery several times a day. (Hr'g Tr. 259, May 23, 2017.) When Griffin goes into the store, she can see the video surveillance screens from the store's security system. (Hr'g Tr. 260, May 23, 2017.) Some of the surveillance screens show the parking lot. (Hr'g Tr. 260, May 23, 2017.)

Griffin estimates that she was in the store for approximately 30 seconds. (Hr'g Tr. 262, May 23, 2017.) While making her purchase, Griffin looked at the surveillance screens on the store's security system. (Hr'g Tr. 262, May 23, 2017.) Griffin was able to see her car in the parking lot, but she saw no other vehicles. (Hr'g Tr. 262-263, May 23, 2017.)

When Griffin got back into her car, she waited a minute and then her brother, Fullwood, arrived driving a white car. (Hr'g Tr. 264-265, May 23, 2017.) Fullwood backed his vehicle beside the passenger side of Griffin's vehicle, and then, without leaving his vehicle, Fullwood talked to Defendant and Griffin. (Hr'g Tr. 265, May 23, 2017.)

Possibly a minute or two later, Thomas arrived with his girlfriend, who was driving the vehicle he was in. (Hr'g Tr. 266, May 23, 2017.) Thomas' girlfriend went into the Crossroads Grocery Store. (Hr'g Tr. 266, May 23, 2017.) Thomas then talked to Defendant and Griffin and entered into the passenger side of Fullwood's vehicle. (Hr'g Tr. 266-267, May 23, 2017.)

When law enforcement arrived, the officers got out of their vehicles and pointed their firearms at Defendant and Griffin.  (Hr'g Tr. 267-268, May 23, 2017.)  Griffin was not paying attention to Defendant's actions.  (Hr'g Tr. 269, May 23, 2017.)

On cross-examination, Griffin testified that she wanted to obtain pizza in addition to Pepsi and tobacco from the store. (Hr'g Tr. 269, May 23, 2017.).  Griffin did not know then and does not now know now what item Defendant had in his underwear.  (Hr'g Tr. 270, May 23, 2017.)  Griffin admitted she helped Defendant sell crack cocaine in the fall of 2015.  (Hr'g Tr. 271, May 23, 2017.)  Griffin did not see Defendant conduct any hand-to-hand transactions with anyone in the parking lot.  (Hr'g Tr. 274, May 23, 2017.)

**IV.    Discussion**

Defendant argues that the Court should enter an order suppressing all evidence obtained by the Government pursuant to his unlawful arrest on September 21, 2016. Mot. Supp. (# 9) at 1. In particular, Defendant contends that law enforcement relied upon information that he had two outstanding orders for his arrest.  Id. at 4.  Defendant further contends that it is now clear that he did not have any outstanding orders for arrest.  Id.  Defendant concludes that he was "undoubtedly arrested" when held at gunpoint and handcuffed; thus, the subsequent search is only justified by a showing of probable cause that he had committed a crime.  Id. at 6.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV: United States v. Kimble, 855 F.3d 604, 610 (4th Cir. 2017).  The exclusionary rule serves as "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation."  Davis v. United States, 564 U.S. 229, 231-32 (2011). The exclusive purpose of the exclusionary rule "is to deter future Fourth Amendment violations."  Id. at 236-37.

"When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."  Id. at 238 (internal quotations omitted).

**A.** **The crack cocaine seized from Defendant's body by officers who relied on incorrect information should not be suppressed.**

The Supreme Court has issued two opinions that provide guidance in the instant case: Arizona v. Evans, 514 U.S. 1 (1995), and Herring v. United States, 555 U.S. 135 (2009).  In Evans, a police officer observed the defendant driving the wrong way on a one-way street in front of the police station.  514 U.S. at 4.  The police officer stopped the defendant and asked to see his driver's license.  Id.  The defendant informed the officer that his license had been suspended.  Id.  The officer made a computer inquiry that confirmed the defendant's license was suspended and also suggested there was an outstanding warrant for his arrest.  Id.

The defendant was arrested, and while being handcuffed, he dropped a hand-rolled cigarette that smelled like marijuana.  Id.  The defendant's car was searched, and a bag of marijuana was discovered.  Id.  The defendant was charged with possession of marijuana.  Id.

It was discovered that the arrest warrant had previously been quashed.  Id.  The defendant argued that the marijuana seized should be suppressed as fruit of an unlawful arrest because his arrest was based on a warrant that had been quashed 17 days prior to his arrest.  Id.  The Chief Clerk of Court testified that there was no indication in the defendant's file that a Clerk had notified the Sheriff's Office that the arrest warrant had been quashed.  Id. at 5.

Citing United States v. Leon, 468 U.S. 897, 906 (1984), the Supreme Court noted that the exclusionary rule operates as a judicially-created remedy designed to safeguard against future Fourth Amendment violations.  In finding that the evidence should not be suppressed, the Supreme Court stated:

If court employees were responsible for the erroneous computer record, the exclusion of evidence at trial would not sufficiently deter future errors so as to warrant such a severe sanction.  First, as we noted in <u>Leon</u>, the exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees.  <u>See</u> <u>Leon</u>, <u>supra</u>, 468 U.S., at 916, 104 S.Ct., at 3417; <u>see also</u> <u>Krull</u>, <u>supra</u>, 480 U.S., at 350, 107 S.Ct., at 1167.  Second, respondent offers no evidence that court employees are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.  <u>See</u> <u>Leon</u>, <u>supra</u>, 468 U.S., at 916, 104 S.Ct., 3417, and n.14; <u>see also</u> <u>Krull</u>, <u>supra</u>, 480 U.S., at 350-351, 107 S.Ct., at 1167-1168.  To the contrary, the Chief Clerk of the Justice Court testified at the suppression hearing that this type of error occurred once every three or four years. App. 37.

Finally, and most important, there is no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on court employees responsible for informing the police that a warrant has been quashed.  Because court clerks are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime, <u>see</u> <u>Johnson v. United States</u>, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), they have no stake in the outcome of particular criminal prosecutions. Cf. <u>Leon</u>, <u>supra</u>, 468 U.S. at 917, 104 S.Ct., at 3417-3418; <u>Krull</u>, <u>supra</u>, 480 U.S., at 352, 107 S.Ct., at 1168.  The threat of exclusion of evidence could not be expected to deter such individuals from failing to inform police officials that a warrant had been quashed. Cf. <u>Leon</u>, <u>supra</u>, 468 U.S., 15 917, 104 S.Ct., at 3417-3418; <u>Krull</u>, <u>supra</u>, 480 U.S., at 352, 107 S.Ct., at 1168.

<u>Evans</u>, 514 U.S. at 14-15.

In <u>Herring</u>, a law enforcement officer asked a warrant clerk to check for outstanding warrants for the defendant.  555 U.S. 137.  When none were found, the officer asked the clerk to check for warrants in a neighboring county.  The clerk in the neighboring county advised there was an active arrest warrant for failure to appear on a felony charge.  <u>Id.</u>  The

defendant was stopped and searched incident to the arrest.  Id. It was discovered that the defendant had methamphetamine in his pocket and a pistol in his vehicle.[10]  Id.

The clerk in the adjoining county learned the arrest warrant had been recalled five months earlier.  Id. at 138.  The defendant moved to suppress the methamphetamine and pistol from introduction into evidence on the grounds that his arrest was illegal.  Id.  In particular, the defendant argued that the search was invalid because the arrest warrant had been rescinded.  Id.

By way of background, the Supreme Court noted:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.  As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. The error in this case does not rise to that level.

555 U.S. at 144.

With respect to the defendant's case, the Supreme Court held:

> Petitioner's claim that police negligence automatically triggers suppression cannot be squared with the principals underlying the exclusionary rule, as they have been explained in our cases.  In light of our repeated holdings that the deterrent effect of suppression must be substantial and outweigh any harm to the justice system, e.g., Leon, 468 U.S., at 909-910, 104 S.Ct. 3405, we conclude that when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not "pay its way." Id., at 907-908, n.6, 104 S.Ct. 3405.  In such a case, the criminal should not "go free because the constable has blundered." People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (opinion of the Court by Cardozo, J.).

---

[10] As a felon, the defendant was prohibited from possessing a firearm.  555 U.S. at 137.

555 U.S. at 147-48.

In the instant case, viewed under either <u>Evans</u> or <u>Herring</u>, the crack cocaine found on Defendant's body is not subject to suppression. The record reveals that the officers found from the RMS system that there were two warrants outstanding for Defendant's arrest, which were based on bills of indictment. (Hr'g Tr. 104, May 23, 2017.) Deputy Warren then used his radio to confirm that the warrants were in fact outstanding. (Hr'g Tr. 156, 194-195, May 23, 2017.) A call was returned from communications that confirmed that the two arrest warrants were, in fact, outstanding. (Hr'g Tr. 194-196, May 23, 2017.) Recordings of the communications were introduced into evidence at the May 23, 2017, evidentiary hearing, and the communications confirmed the existence of the warrants. (Gov.'s Ex. 6.) A telephone call was placed to CDE, which further confirmed the existence of the warrants, and the warrants were, in fact, "in his hand." (Hr'g Tr. 70-72, May 23, 2017.) The communications operator then confirmed the existence of the warrants with the original requesting officer. (Hr'g Tr. 70-72, May 23, 2017.)

The evidence is conflicting about whether Deputy Warren confirmed the existence of the warrants immediately before or immediately after Defendant's arrest. Deputy Lambert testified that the confirmation was made by Deputy Warren <u>before</u> the arrest. (Hr'g Tr. 156, May 23, 2017.) Deputy Warren testified he made the call for confirmation concerning the existence of the warrants immediately <u>after</u> Defendant's arrest. (Hr'g Tr. 194-195, May 23, 2017.)

The timing of the confirmation call does not affect the outcome in this case because dismissal of the bills of indictment was not discovered until 7:23 p.m. when Defendant arrived at the Buncombe County Jail. This was more than three hours after Defendant was

arrested. (Gov.'s Exs. 1, 2, 3.) Whether the call for confirmation was made before or after Defendants' arrest, it would have shown that the arrest warrants were in existence.

In sum, the actions in this case rise to the level of negligence, at most. The fact that there have been a few instances (Hr'g Tr. 17, May 23, 2017) of warrants showing as existing on the RMS system and not on the NCAware system does not establish recurring, systematic, or reckless disregard.[11]  Rather, the Court finds that the multiple calls for confirmation of the warrants reflects "good faith" by the officers.  See United States v. Brown, 618 F. App'x 743, 745 (4th Cir. 2015) (per curiam) (concluding that if an officer acts with "objectively reasonable reliance on incorrect database information," the officer acts in "good faith" and the exclusionary rule is inapplicable).

**B.      The officers had a reasonable and articulable suspicion that Defendant was engaged in criminal activity to support an investigative detention.**

In United States v. Foster, 634 F.3d 243 (4th Cir. 2011), the Fourth Circuit Court of Appeals established the standard for determining the constitutionality of an investigative detention or stop.  In particular, the Court held:

> The Fourth Amendment permits an officer to make an investigative detention or stop only if supported "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed. 2d 890 (1980).  "And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  Thus, a court must look to the totality of the circumstances in determining whether the officer had a particularized and objective basis for suspecting criminal activity.

---

[11] Defendant argues that Buncombe County's reliance on software they know to be inaccurate is at a minimum gross negligence.  Def.'s Closing Argument (# 34) at 4.  The Court disagrees because the evidence before does not support a conclusion that the County knows RMS to be inaccurate. Moreover, even if Defendant's argument is accurate, this knowledge cannot be imputed by inference to law enforcement. Id.

> United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151
> L.Ed.2d 740 (2002). "While such a detention does not require
> probable cause, it does require something more than an "inchoate
> and particularized suspicion or hunch."" United States v. Sprinkle,
> 106 F.3d 613, 617 (4th Cir. 1997) (quoting Terry, 392 U.S. 15 27,
> 88 S.Ct. 1868).

Id. at 246. "Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).

In the instant case, there were objective and particularized facts that were sufficient, when considered together, to give rise to a reasonable suspicion that Defendant was in possession of and distributing a controlled substance. First, the parking lot of the Crossroads Grocery Store is a known "open air drug market." (Hr'g Tr. 87-88, May 23, 2017.) Prior to September 21, 2016, Detective Hendricks had observed drug transactions in the parking lot. (Hr'g Tr. 87-88, May 23, 2017.) Just two weeks prior to September 21, 2016, in the same parking lot, Deputy Warren had been involved in a foot chase where he was assaulted. (Hr'g Tr. 165-166, May 23, 2017.) See United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997) (An area's propensity toward criminal activity is something an officer may consider in developing a reasonable suspicion.).

Second, the knowledge the officers had about Defendant's history is an important factor in developing a basis for a belief that Defendant was selling controlled substances. Detective Hendricks knew that Defendant had previously made three undercover drug sales. (Hr'g Tr. 89-94, 108, 112, 128, 227, May 23, 2017.) Deputy Lambert knew Defendant from an investigation that occurred just a week prior to September 21, 2016.

(Hr'g Tr. 141, May 23, 2017.)  Deputy Warren knew Defendant was a violent offender. (Hr'g Tr. 166-167, May 23, 2017.)

Third, Defendant's actions provided an objective basis for believing he sold a controlled substance in broad daylight in the presence of Detective Hendricks.  Detective Hendricks testified as to his training and experience regarding hand-to-hand sales of controlled substances, and based upon this training and experience, he believed Defendant made two such sales in his presence.  (Hr'g Tr. 85, 108, 128, May 23, 2017.)  The acts of Defendant in reaching behind his back when the officers arrived caused Deputy Ball to develop the opinion that Defendant was either concealing something or was going to "pull something." (Hr'g Tr. 207, May 23, 2017.)  When Deputy Warren arrived, Defendant's actions caused him to think Defendant was reaching for a weapon. (Hr'g Tr. 169, 180, May 32, 2017.) See United States v. Raymond, 152 F.3d 309, 312 (4th Cir. 1998) (A suspect's suspicious movements can be taken to suggest that the suspect has a weapon.).

Finally, when Defendant was removed from the red sedan, no actual search of Defendant was necessary to discover the crack cocaine.  Deputy Ball saw the plastic baggy in Defendant's underwear that appeared to contain crack cocaine.  (Hr'g Tr. 208, May 23, 2017.)  Deputy Warren pointed out the bulge and the bag located in Defendant's underwear to Deputy Ball (Hr'g Tr. 171-173, 191-192, May 23, 2017) and described the baggy as the type generally used to transport narcotics (Hr'g Tr. 174, May 23, 2017).

Therefore, the facts and circumstances taken together show that law enforcement had a particularized and objective basis for suspecting criminal activity, even without considering the mistaken warrants.

Next, Defendant essentially argues that Detective Hendricks provided a false statement concerning what he reported as the two drug sales. Def.'s Closing Argument (# 34) at 5-6. Defendant attempts to support his argument with the testimony from Griffin. Id. at 5.

When evaluating the credibility of a witness, the court can consider "variations in demeanor and tone of voice." Anderson v. Bessemer City, N.C., 470 U.S. 564, 575 (1985). The court can also consider documents and objective evidence, which may contradict the witness's testimony or show inconsistencies, id., in addition to the witness's motive to lie and the specificity of his statements. Jackson v. United States, Nos. 5:07-CR-110-FL-1, 5:12-CV-205-FL, 2014 WL 7149635, at *4 (E.D.N.C. Dec.15, 2014) (citing United States v. Wilson, 624 F.3d 640, 665 (4th Cir. 2010)).

An examination of Griffin's testimony shows that she was previously convicted of assisting Defendant in the sale of crack cocaine. (Hr'g Tr. 271, May 23,017.) Griffin is the fiancé of Defendant (Hr'g Tr. 257, 269, May 23, 2017), and the sister of Fullwood (Hr'g Tr. 94, May 23, 2017). Therefore, Griffin's testimony must be scrutinized carefully. Griffin's testimony regarding what she saw on the surveillance screens inside the Crossroads Grocery Store changed when she was questioned under cross-examination. (Hr'g Tr. 274-275, May 23, 2017.) In addition, Detective Hendricks had been told of the outstanding warrants for Defendant's arrest. Thus, Detective Hendricks would have had no reason to make up a false statement about the two hand-to-hand transactions as support to make an encounter with Defendant. For these reasons, the issue of credibility is weighed in favor of Detective Hendricks.

Without considering the existence or non-existence of the warrants for Defendant's arrest, the actions of the officers in this matter were supported by a reasonable and articulable suspicion that Defendant was engaged in criminal activity. Thus, Defendant's stop, seizure, and examination were reasonable under the circumstances. Consequently, the crack cocaine found by the officers should not be suppressed.

## V.  Conclusion

In light of the foregoing, it is RECOMMENDED that Defendant's Motion to Suppress (# 9) be DENIED.

Signed: December 1, 2017

Dennis L. Howell
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same.  **Responses to the objections must be filed within fourteen (14) days of service of the objections.**  Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal.  Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).